| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | No. 13-00083-01-CR-W-BCW |
| TONY EUGENE WARDLOW, | |
| Defendant. | |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S PRO SE MOTION TO REDUCE SENTENCE PURSUANT 18 U.S.C. §3582(c)(1)(A)(i) – COMPASSIONATE RELEASE

The United States of America, through Timothy Garrison, United States Attorney for the Western District of Missouri, and the undersigned attorney, provides the following response in opposition to Tony Eugene Wardlow's (hereinafter "Wardlow" or "defendant") motion for compassionate release. The defendant seeks to have his 250-month sentence for transporting a minor for prostitution reduced to time served based upon extraordinary and compelling reasons. The defendant argues extraordinary and compelling reasons exist because the coronavirus (COVID-19) places him at risk if the defendant remains in the custody of the Bureau of Prisons (BOP). (D.E. #207.) Because the defendant has not exhausted his administrative remedies, and has not demonstrated extraordinary and compelling reasons justifying a reduction, the Government opposes the request and asks the Court to deny the defendant's motion.

### I. Procedural History

Tony Eugene Wardlow was indicted March 13, 2013, by a grand jury sitting in the Western District of Missouri with commercial sex trafficking of a child, enticement of a minor, transportation of a minor for prostitution, and felon in possession of a firearm. On December 17,

2014, Wardlow was found guilty of transporting a minor for prostitution and acquitted on the charge of being a felon in possession of a firearm. (D.E. #161.) On July 9, 2018, Wardlow was sentenced to 250-months' imprisonment. (D.E. #185.) Wardlow appealed his conviction and sentence, but both were affirmed by the Eighth Circuit Court of Appeals. (D.E. #200.) Wardlow also sought post-conviction relief under 18 U.S.C. § 2255, but this was also denied. (D.E. #204.)

Based on the information made available on the Bureau of Prisons Inmate Locator, the defendant's release date is February 6, 2031. (*See* https://www.bop.gov/inmateloc/.)

On July 17, 2020, Wardlow filed a motion under 18 U.S.C. § 3582, seeking immediate release, claiming that the current situation regarding the Coronavirus (COVID-19) places him at risk if he remains in custody and that extraordinary and compelling reasons warrant his immediate release. (D.E. #207.) Defendant claims that he made an internal request to the Warden at FCI Forrest City on approximately May 18, 2020; however, FCI Forrest City has no record of receiving such a request and Wardlow failed to attach a copy of said request, so his claim has not been and cannot be independently corroborated. (D.E. #207.)

## II. <u>First Step Act</u>

The First Step Act, effective December 21, 2018, provides inmates the ability to file a motion for compassionate release, an ability previously only vested in the United States Bureau of Prisons (BOP).  Under 18 U.S.C. § 3582(c) a court may not modify a term of imprisonment once it has been imposed except that, under subsection § 3582(c)(1)(A), a court may reduce a term of imprisonment upon finding "extraordinary and compelling reasons," if such reduction is consistent with applicable policy statements of the Sentencing Commission, after considering the factors set forth in 18 U.S.C. § 3553(a), and after determining the defendant is not a danger to the community as provided in 18 U.S.C. § 3142(g). (U.S.S.G. § 1B1.13(2).).The pertinent policy statement, U.S.S.G. § 1B1.13, defines

2

specific medical, age, and family circumstances as possibly justifying a sentencing reduction under this statute, and further authorizes a sentencing reduction based on an extraordinary and compelling circumstance identified by the BOP. (§1B1.13 Commentary n.1(D).)

The statute, 18 U.S.C. §3582(c)(1)(A), originally permitted judicial relief only upon a motion by the Director of the BOP. Section 603(b) of the First Step Act now permits courts to act "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

As the proponent of a motion, the inmate bears the burden of proving both that they have satisfied the procedural prerequisites for judicial review—*i.e.*, that they have "exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on [his] behalf" or that 30 days have lapsed "from the receipt of such a request by the warden"—and that "extraordinary and compelling reasons" exist to support the motion.  18 U.S.C. § 3582(c)(1)(A); *see United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) ("[A] defendant, as the § 3582(c)(2) movant, bears the burden of establishing that a retroactive amendment has actually lowered his guidelines range in his case.").

### III. <u>The Defendant Has Failed To Exhaust Administrative Remedies</u>

The Court lacks authority to act on the defendant's motion for compassionate release at this time. The statute requires that a request for compassionate release be presented first to the Bureau of Prisons for its consideration; only after 30 days have passed, or the defendant has exhausted all

administrative rights to appeal the Bureau's failure to move on the defendant's behalf, may a defendant

move for compassionate release in court.

The compassionate release statute provides, in pertinent part:

The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . .

18 U.S.C. § 3582(c)(1)(A).

The statutory restriction is mandatory, and it continues to serve an important function during

the present crisis. The Government is very mindful of the concerns created by COVID-19, and the

BOP is making its best effort both to protect the inmate population and to address the unique

circumstances of individual inmates.

The Third Circuit recently held that a defendant seeking COVID-19 compassionate release

must meet the 30-day exhaustion requirement with BOP:

We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like [defendant]. But the mere existence of COVID-19 in society and the possibility that it might spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread. Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance. And given the Attorney General's directive that BOP "prioritize the use of [its] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic," we anticipate that the exhaustion requirement will be speedily dispatched in cases like this one.

*United States v. Raia*, 954 F.3d 594 (3d Cir. 2020) (citations omitted).

In this matter, the defendant claims he presented his request for compassionate release to the FCI Forrest City Warden on May 18, 2020. The Government has consulted with the BOP related to the defendant's request, and the BOP stated they have no record of receiving such a request. At this time, the defendant's motion is premature and a dismissal is appropriate.

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 825 (2010). As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only pursuant to statutory authorization. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

Consistent with that principle of finality, Section 3582(c) provides that a court generally "may not modify a term of imprisonment once it has been imposed," 18 U.S.C. § 3582(c), except in three circumstances: (1) upon a motion for reduction in sentence under 18 U.S.C. § 3582(c)(1)(A), such as that presented by the defendant; (2) "to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure," 18 U.S.C. § 3582(c)(1)(B); and (3) where the defendant was sentenced "based on" a retroactively lowered sentencing range, 18 U.S.C. § 3582(c)(2).

Given the plain language and purpose of the statute, the requirements for filing a sentence reduction motion—including the requirement that a defendant exhaust administrative remedies or

5

wait 30 days before moving in court for compassionate release—are properly viewed as jurisdictional.

Section 3582(c) states that a "court may not modify" a term of imprisonment except in enumerated

circumstances. 18 U.S.C. § 3582(c). It thus "speak[s] to the power of the court rather than to the rights

or obligations of the parties," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (citation omitted),

delineating "when, and under what conditions," a court may exercise its "'adjudicatory authority,'"

*Bowles v. Russell*, 551 U.S. 205, 212-13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005)

(per curiam)). That conclusion is reinforced by the historical powerlessness of the courts to modify a

sentence after the expiration of the term at which it was entered. *See United States v. Mayer*, 235 U.S. 55,

67-69 (1914); *United States v. Welty*, 426 F.2d 615, 617-618 & n.8 (3d Cir. 1970). Section 3582(c)

accordingly has been understood as conferring the jurisdictional authority that previously was lacking

by providing express statutory authorization to modify otherwise final sentences.[1]

We recognize that, in recent years, the Supreme Court has cautioned against imprecise use of

the "jurisdictional" label, and explained that a statutory claim-processing rule, even if mandatory, is

presumed to be nonjurisdictional absent a clear statement to the contrary. *See Fort Bend County v. Davis*,

139 S. Ct. 1843, 1848-50 (2019). A prescription is not jurisdictional merely because "it 'promotes

important congressional objectives,'" *id.* at 1851 (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154,

169 n.9 (2010)), and courts should not deem jurisdictional rules that "seek to promote the orderly

---

[1] A number of courts have recognized that the prerequisites for relief under Section 3582(c)(2), which allows a sentence reduction based on a retroactive guideline amendment, are jurisdictional. *See, e.g.*, *United States v. Auman*, 8 F.3d 1268, 1271 (8th Cir. 1993); *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010); *United States v. Williams*, 607 F.3d 1123, 1125-26 (6th Cir. 2010); *United States v. Austin*, 676 F.3d 924, 930 (9th Cir. 2012); *United States v. Graham*, 704 F.3d 1275, 1279 (10th Cir. 2013); *United States v. Mills*, 613 F.3d 1070, 1078 (11th Cir. 2010); *see also United States v. Higgs*, 504 F.3d 456 (3d Cir. 2007) (canvassing history of judicial treatment of Rule 35 as jurisdictional and holding that Rule 35(a) and Section 3582(c)(1)(B) remain jurisdictional after *Bowles*). Other courts disagree. *See, e.g.*, *United States v. Johnson*, 732 F.3d 109, 116 n.11 (2d Cir. 2013); *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015).

progress of litigation by requiring that the parties take certain procedural steps at certain specified times," *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). But whether a prescription is jurisdictional turns on Congress's intent, which is properly determined by the text, context, relevant historical treatment, and purpose of the provision. *Henderson*, 562 U.S. at 436. Here, the relevant factors indicate that Section 3582(c) sets forth a jurisdictional limitation on a district court's authority to modify a sentence, such that a district court lacks jurisdiction to consider a motion for compassionate release where the defendant has failed to satisfy the exhaustion requirement of Section 3582(c)(1)(A).[2]

While the Government maintains that the time limitation in Section 3582(c)(1)(A) is jurisdictional, given that it stands as an exception to the historic and fundamental rule that courts may not revisit a final criminal judgment, the point is ultimately academic. Even if the exhaustion requirement of Section 3582(c)(1)(A) is not jurisdictional, it is at least a mandatory claim-processing rule and must be enforced if a party "properly raise[s]" it. *Eberhart*, 546 U.S. at 19 (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the verdict, is a nonjurisdictional but mandatory claim-processing rule). The government raises the rule here, and it must be enforced.[3]

The Supreme Court reaffirmed that principle in *Ross v. Blake*, 136 S. Ct. 1850 (2016), in which the Court rejected a judicially created "special circumstances" exception to the exhaustion requirement stated in the Prison Litigation Reform Act of 1995 (PLRA). That Act mandates that an inmate exhaust

---

[2] Although we use the term "exhaustion requirement," to be clear, an inmate need not "exhaust" administrative remedies if the motion is filed in court 30 days after receipt of a request by the warden.

[3] Indeed, even those courts that have concluded that the requirements of Section 3582(c)(2) are not jurisdictional still largely enforce the statutory prerequisites to relief. *See, e.g.*, *Taylor*, 778 F.3d at 670 (recognizing that even if a court has the "power to adjudicate" a motion under Section 3582(c)(2), it may lack "authority to *grant* a motion . . . because the statutory criteria are not met") (emphasis in original).

"such administrative remedies as are available" before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a). Rejecting the "freewheeling approach" adopted by some courts of appeals, under which some prisoners were permitted to pursue litigation even when they had failed to exhaust available administrative remedies, *Ross*, 136 S. Ct. at 1855, the Court demanded fidelity to the statutory text, explaining that the "mandatory language" of the exhaustion requirement "means a court may not excuse a failure to exhaust" even to accommodate exceptional circumstances, *id.* at 1856. The Court stated:

> No doubt, judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions. *See McKart v. United States*, 395 U.S. 185, 193 (1969) ("The doctrine of exhaustion of administrative remedies . . . is, like most judicial doctrines, subject to numerous exceptions"). But a statutory exhaustion provision stands on a different footing. There, Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to. For that reason, mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.

*Id.* at 1857.

That rule plainly applies to the statutory text here. Section 3582(c)(1)(A) unambiguously permits a motion to the Court only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."[4]

The requirement of a 30-day period to afford BOP the initial review of the defendant's request therefore cannot be excused. While Congress indisputably acted in the First Step Act to expand the availability of compassionate release, it expressly imposed on inmates the requirement of initial resort

---

[4] Unlike the exhaustion provision in *Ross*, which required only exhaustion of "available" administrative remedies, 136 S. Ct. at 1858, the compassionate release statute contains no such exception.

to administrative remedies. And this is for good reason: The Bureau of Prisons conducts an extensive assessment for such requests. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. As the Procedures reflect, the Bureau of Prisons completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. Its assessment will always be of value to the parties and the Court.

For all of these reasons, BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations based on an inmate's background and medical history, and more general considerations regarding the conditions and needs at particular facilities. The provision of Section 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at the present time. Even if this Court could ignore the mandatory exhaustion requirement, which it cannot, it would be imprudent to prevent BOP from engaging in that review.

This remains true in the present crisis. The Government does not downplay the defendant's concerns in any way, however, the defendant has not fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier.

### IV. **BOP Response to the Coronavirus Pandemic**

The BOP has taken significant measures to protect the health of all inmates. The BOP began planning for potential coronavirus transmissions in January 2020. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control (CDC), including by reviewing guidance from the World Health Organization

9

(WHO). On March 13, 2010, the BOP announced that it was implementing the Coronavirus (COVID 19) Phase II Action Plan in order to minimize the risk of COVID-19 transmission into and inside its facilities. The Action Plan comprises many preventive and mitigation measures, including the following:

- **Screening of Inmates and Staff:** All new BOP inmates are screened for COVID-19 symptoms and risk of exposure. Asymptomatic inmates with a documented risk of exposure will be quarantined; symptomatic inmates with documented risk of exposure will be isolated and tested pursuant to local health authority protocols. In areas with sustained community transmission, all facility staff will be screened for self-reported risk factors and elevated temperatures. (Staff registering a temperature of 100.4 degrees F or higher will be barred from the facility).

- **Quarantine Logistics:** All BOP institutions establish quarantine areas within their facilities to house any inmates found to be infected with or at heightened risk of being infected with coronavirus pursuant to the above-described screening protocol.

- **Suspension of Social Visits and Tours:** The BOP placed a 30-day hold on all social visits and tours.

- **Suspension of Legal Visits:** The BOP placed a 30-day hold on legal visits, with exceptions permitted on a case-by-case basis.

- **Suspension of Inmate Movements:** The BOP ceased the movement of inmates amongst its facilities for at least 30 days, with exceptions for medical treatment and other exigencies.

- **Modified Operations:** BOP facilities modified operations in order to maximize social distancing.

On March 18, 2020, the BOP implemented Phase III of the Action Plan maximizing telework for locations that perform administrative services. All cleaning, sanitation, and medical supplies were inventoried, and sufficient supplies were on hand and ready to be distributed to facilities as necessary. The BOP placed additional orders for supplies, in case of a protracted event.

*See* https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf (phases I-III).

10

Phase IV of the Action Plan was implemented on March 26, 2020. The BOP revised and updated its quarantine and isolation procedures to require all newly admitted inmates, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check. Asymptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

On April 1, 2020, in response to a growing number of quarantine and isolation cases, the BOP implemented Phase V and directed the following actions be taken immediately to further mitigate the exposure and spread of COVID-19:

- For a 14-day period, inmates in every institution be secured in their cells/quarters to decrease the spread of the virus.

- During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

- The BOP is to coordinate with the United States Marshals Service to significantly decrease incoming movement during this time.

- After 14 days, this decision will be reevaluated.

- Limited group gathering will be afforded to the extent practical to facilitate, commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access.

*See* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (phases IV-V).

Phase VI, implemented on April 13, 2020, extended all Phase V measures until May 18, 2020. https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf. On April 23, 2020, and again on May, 7, 2020, the BOP announced they had substantially expanded their ability to test inmates for COVID-19 by using Abbott ID NOW instruments for Rapid RNA testing. https://www.bop.gov/resources/news/pdfs/20200423_press_release_covid19_testing.pdf;

11

https://www.bop.gov/resources/news/pdfs/20200507_press_release_expanding_rapid_testing.pdf

Phase VII, announced on May 18, 2020, extended all measures from Phase VI, and will remain in place through June 30, 2020, at which time the plan will be evaluated. https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp. Further details regarding the BOP's COVID-19 action plan and efforts are available at https://www.bop.gov/resources/news/20200313_covid-19.jsp and at a daily updated resource page: https://www.bop.gov/coronavirus/index.jsp.[5]

Taken together, these measures are designed to sharply mitigate the risks of COVID-19 transmission in a BOP institution. BOP professionals continue to monitor this situation and adjust practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately inmates have nevertheless become ill, and more likely will in the weeks ahead. But the solution is not to exclude BOP from reviewing applications for compassionate release. There are many challenging factors to consider during this pandemic, and the BOP should have the opportunity to assess those factors during the statutorily required review period. For example, notwithstanding the current pandemic crisis, the BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of transportation for

_____

[5] According to the resource page, due to the rapidly evolving nature of this public health crisis, the BOP will update the dashboard daily at 3:00 p.m. based on the most recently available data from across the agency as reported by the BOP's Office of Occupational Health and Safety.

inmates (at a time that interstate transportation services often used by released inmates are providing reduced if any service), and of supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, the BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Further, Section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), enacted on March 27, 2020, permits the BOP, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau of Prisons, to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate." Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note.) On April 3, 2020, the Attorney General gave the Director of the BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidents of coronavirus transmission.

Even though the Government has asked the Court to dismiss the defendant's motion, the Government is sensitive to the issues the defendant raises related to the coronavirus pandemic. The

13

Government does not minimize the concern or the risk to inmates such as the defendant. At the present time, the BOP has taken aggressive action to mitigate the danger for all inmates.

### V. The Defendant has Not Identified Extraordinary and Compelling Reasons

The Sentencing Commission's pertinent policy statement related to extraordinary or compelling reasons appears at U.S.S.G. § 1B1.13. As amended November 1, 2018, the statement repeats the text of 18 U.S.C. § 3582(c)(1)(A) and adds that the court should reduce the sentence only if the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

The BOP promulgated Program Statement 5050.50, amended effective January 17, 2019, to set forth its own internal criteria for evaluating compassionate release requests. Courts have frequently upheld the BOP's discretionary authority in its management duties over federal prisoners. *See Tapia v. United States*, 564 U.S. 319, 331 (2011) ("When a court sentences a federal offender, the BOP has plenary control, subject to statutory constraints, over [the place of imprisonment and treatment programs].").

Defendant appears to claim two rationales in support of his request for compassionate release: medical conditions and his age. Defendant's arguments lack any substantive support and are without merit. We address each in turn.

**Medical Condition of the defendant**

The application notes for U.S.S.G. 1B1.13 define medical condition of the defendant as:

Medical Condition of the Defendant.--

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is--

14

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(U.S.S.G. § 1B1.13 Application Note 1(A).)

In this case, defendant claims to suffer from diabetes with diabetic neuropathy, high blood pressure, high cholesterol, and is overweight. (D.E. #207.) Whether viewed individually or collectively, none of these conditions provide a justifiable basis to demonstrate he suffers from a medical condition sufficient to warrant relief under this section. None of those conditions – alone or together – could be construed as a terminal illness with an end of life trajectory. Further, none of these conditions could be viewed as substantially diminishing his ability to provide self-care within the environment of the facility.

The defendant has made an inadequate showing of extraordinary and compelling circumstances. There are no extraordinary and compelling reasons, as those terms are defined for the purpose of 18 U.S.C. § 3582(c)(1)(A), justifying compassionate release or any form of sentence reduction in this case.

The defendant argues his medical condition places the defendant at an increased risk should the defendant contract the coronavirus. (D.E. #207.) Unfortunately, the defendant's circumstance is not extraordinary in the context that many individual across the nation are in the same or similar position as the defendant, and the defendant's medical condition remains the same whether he is released. While the Government is attune to the difficulties facing inmates, this particular instance simply fails to meet the requirements of the law and policy. In *Dillon v. United States*, 560 U.S. 817, 826,

15

(2010) the Supreme Court determined that the sentencing court could only consider a reduction in sentencing if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. Based on that reasoning, U.S.S.G. § 1B1.13 Application Note 1(A) is mandatory and the defendant's request does not meet the requirements for release.

**Age of the defendant**

The application notes for U.S.S.G. 1B1.13 define age of the defendant as:

Age of the Defendant.--

The defendant --

   (i) is at least 65 years old;

   (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and

   (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(U.S.S.G. § 1B1.13 Application Note 1(B).)

In this case, defendant alleges his age – being over the age of 50 – presents an extraordinary and compelling circumstance. (D.E. #207.) The defendant has made an inadequate showing of extraordinary and compelling circumstances. Defendant is presently 61 years old. He does not meet any of the criteria of this provision of the Guidelines, as he has not served at least 10 years or at least 75 percent of his term of imprisonment.

The defendant's motion, however, does not address the measures that the BOP is undertaking to prevent the spread of the virus. Although our nation in the midst of a national crisis requiring extraordinary measures, § 3582 contemplates compassionate release, not the widespread release of inmates serving lawfully-imposed sentences.

16

## VII. Defendant Remains a Danger to the Community

This Court may not reduce the defendant's sentence unless it finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." USSG § 1B1.13. This defendant is a danger to the community, and should not be considered for compassionate release.

Under 18 U.S.C. § 3142(g), the Court must consider four factors in determining whether the defendant might present a danger: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(1)–(4). Consideration of these factors—which are not affected by COVID-19—does not allow this Court to conclude that this defendant is not a danger to the safety of any other person or the community.

Many factors under 18 U.S.C. § 3142 support defendant's continued detention. The nature and circumstances of his offense of conviction – transportation of a minor for prostitution – is *per se* dangerous. Transportation of a minor for prostitution is aa felony offense under chapter 117, and this offense constitutes a "crime of violence" under 18 U.S.C. §§ 3142(f) and 3156(4)(C). The weight of the evidence is demonstrated by the Eighth Circuit's affirmation of Wardlow's conviction and sentencing enhancements. *See United States v. Wardlow*, 340 F.3d 817 (8th Cir. 2016). Lastly, Wardlow's history and characteristics makes him an unusually dangerous to society. Wardlow had sustained multiple felony convictions prior to this instant offense of conviction, including prior convictions for

17

endangering the welfare of a child (1ˢᵗ degree) and sexual misconduct (1ˢᵗ degree) and a previous federal felony conviction in this district court for being a felong in possession of a firearm.[6]

Nothing about the COVID-19 pandemic reduces the defendant's danger to others.

The defendant has failed to demonstrate that the § 3142(g) factors the Court considered at the time of detention or the § 3553(a) factors the Court considered at the time of sentencing have changed, therefore the Court should deny the defendant's motion for immediate release.

## **CONCLUSION**

Based on the foregoing, the Government respectfully requests that the defendant's motion for compassionate release be denied.

Respectfully submitted this 6th day of August, 2020.

Timothy A. Garrison
United States Attorney

*/s/Patrick D. Daly*

PATRICK D. DALY
Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 E. 9th Street, Suite 5510
Kansas City, Missouri 64106
Telephone: (816) 426-3122

---

[6] *See* State of Missouri v. Tony E. Wardlow, Case No. CR797-34 (Nodaway County) and United States v. Tony E. Wardlow, Case No. 02-00073-01-CR-W-FJG (W.D. Mo).

18

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was delivered on August 6, 2020, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record and to defendant via USPS Certified Return Receipt Requested at:

Inmate Tony Wardlow
Reg. No. 15072-045
FCC Forest City Low
P.O. Box 9000
Forrest City, Arkansas 72336

*Patrick D, Daly /s/*
PATRICK D. DALY
Assistant United States Attorney

19